JONATHAN K. THORNE (Bar No. 12694)
LAUREN I. SCHOLNICK (Bar No. 7776)
**STRINDBERG SCHOLNICK BIRCH**
**HALLAM HARSTAD THORNE**
40 South 600 East
Salt Lake City, UT 84102
Tel: (801) 359-4169
Fax: (801) 359-4313
jonathan@utahjobjustice.com
lauren@utahjobjustice.com

*Attorneys for Plaintiffs*

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
### CENTRAL DIVISION

| | |
|---|---|
| **ISILELI TAUSINGA,** | **COMPLAINT (Jury Demanded)** |
| Plaintiff, | |
| v. | Civil No. 2:23-CV-00449 |
| **SALT LAKE LEGAL DEFENDER ASSOCIATION,** | |
| Defendant. | |

Isileli Tausinga ("Mr. Tausinga" or "Plaintiff"), by and through his undersigned attorneys, hereby complains and alleges against Defendant Salt Lake Legal Defender Association ("SLLDA" or "Defendant") as follows:

## NATURE OF THE CLAIMS

1. This action is brought against Defendant pursuant to 42 U.S.C. § 1981 ("§ 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 ("Title VII"), as amended, for race and national origin discrimination and retaliation.

2. Plaintiff seeks damages, attorneys' fees, costs and interest, emotional distress, punitive, compensatory, and all other awardable damages.

## PARTIES

3. Defendant Salt Lake Legal Defender Association ("SLLDA") is a 501(c)(3) non-profit organization that provides legal services to indigent individuals in Utah, and its primary place of business is in Salt Lake City, Utah.

4. Plaintiff Isileli Tausinga resides in the State of Utah, Salt Lake County, and worked for Defendant at its Salt Lake City, Utah location at all times relevant to the allegations in this Complaint.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this civil action arising under federal law pursuant to 28 U.S.C. § 1331.

6. Venue is proper in this District pursuant to 29 U.S.C. § 1391, because the events alleged herein took place within this judicial district.

7. Mr. Tausinga timely filed a Charge of Discrimination alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 ("Title VII") with the U.S. Equal Employment Opportunity Commission ("EEOC") on or around March 28, 2022 and has exhausted his administrative remedies within the meaning of Title VII. A copy of the Charge is attached hereto as Ex. A.

8. The EEOC issued Mr. Tausinga a Notice of Right to Sue ("Notice") on April 20, 2023. A copy of that Notice is attached hereto as Ex. B. This Complaint has been filed within 90 days of Mr. Tausinga receiving the Notice.

## FACTUAL BACKGROUND

9. Defendant SLLDA is a nonprofit law firm that provides legal representation to indigent individuals accused of crimes in Salt Lake County.

10. SLLDA employed Plaintiff Isileli Tausinga for over a decade, starting in 2007 when it hired him as an Investigator.

11. Mr. Tausinga loved his job and the work he provided for the community.

12. During his tenure he made a great impact on SLLDA's work, which resulted in Patrick Anderson, former director of SLLDA, promoting him to Chief Investigator in 2015, where he oversaw its investigative team. Mr. Tausinga's annual evaluations were always excellent.

13. In approximately 2017, Richard Mauro replaced Mr. Anderson as Executive Director.

14. In 2018, SLLDA hired Charlotte Miller as its Assistant Director and Human Resources.

15. During his tenure, Mr. Tausinga, a Pacific Islander, was the only Division Lead who was a person of color.

16. Despite Mr. Tausinga's contributions, SLLDA subjected him to discriminatory treatment, which hindered his ability to do his job.

17. Starting in 2019, SLLDA began treating Mr. Tausinga worse than his white colleagues, which hindered his ability to do his job.

18. In 2019, during a firm-wide company meeting with all employees present, Mr. Mauro gave a presentation highlighting the accomplishments of each division except for the Investigation Division, headed by Mr. Tausinga. Other SLLDA employees noticed and commented on this exclusion, causing Mr. Tausinga profound embarrassment.

19. Then in August 2020, Mr. Tausinga opposed Ms. Miller's decision to move investigative aides away from Mr. Tausinga and his assistant.

20. In protesting the move, Mr. Tausinga told Ms. Miller that he felt she was treating him and the Division he led poorly and differently, because he and his employees were primarily people of color. Notably, the Investigation Division employees were primarily Latinx, Pacific Islander, or other people of color, mostly with Spanish language skills.

21. In August 2020, Mr. Mauro and Ms. Miller ignored Mr. Tausinga's concern about understaffing of his division. Specifically, they ignored his request to replace a legal assistant who transferred to another Division.

22. Additionally, Mr. Tausinga knew SLLDA also treated Kenny Augustin, a Black Haitian investigator, unfairly compared to his white co-workers. For example:

   a. When SLLDA interviewed Mr. Augustin in 2016, Mr. Tausinga witnessed an SLLDA Administrator ask Mr. Augustin if he understood English and tell Mr. Augustin that in America, we speak English.

   b. In 2018, Mr. Mauro, without explanation, denied Mr. Augustin a raise after he completed his master's degree, even though Mr. Mauro gave a white investigator with less SLLDA tenure a raise for completing a bachelor's degree.

   c. In 2020, Mr. Mauro hired a white individual with less experience and fewer qualifications than Mr. Augustin as Mitigation Investigator. When Mr. Augustin asked why he was not selected for the position, Mr. Mauro falsely claimed that SLLDA did not think he was interested in the position. When Mr. Augustin reported to Mr. Mauro that he believed he was not chosen based on his color, there was no investigation and Mr. Mauro claimed that Mr. Augustin had committed internal misconduct. Mr. Augustin then tried to

meet with the SLLDA Board to report the discrimination. But Mr. Mauro refused his request.

    d. In 2020, when Ms. Miller denied Mr. Augustin the use of a laptop, commonly provided to other investigators for a client interview, his supervising attorney had to convince Ms. Miller to approve the laptop's use. After that, Ms. Miller yelled at Mr. Augustin (in front of Mr. Mauro) for questioning her original denial.

    e. Thereafter, during the COVID-19 Pandemic, Mr. Augustin was forced to spend his own money to purchase a work laptop when Ms. Miller again refused Mr. Augustin use of a laptop, which SLLDA issued to its other employees to enable work from home.

23. After learning about Mr. Augustin's treatment, Mr. Tausinga decided he needed to report the unfair treatment both he and other employees of color experienced, hoping to stop the mistreatment.

24. Around August 2020, Mr. Tausinga told Ms. Miller, "Some of us people of color don't feel like we're treated fairly here because of implicit bias. Just ask [Mr. Augustin] and he'll tell you how he feels he's been treated here because he is a black man."

25. During this report, Ms. Miller became upset and appeared offended that Mr. Tausinga raised these issues, including implicit bias and Mr. Augustin's experiences. She

refused to accept Mr. Tausinga's report of discrimination, even though she previously trained SLLDA employees on both discrimination and implicit bias.

26. After his discrimination report to her, Ms. Miller repeatedly refused to speak to or acknowledge Mr. Tausinga. She even refused to talk to him about necessary work matters, choosing instead to communicate with him through his assistant, Joey Finocchio.

27. Additionally, Ms. Miller began to attend Investigation Division team meetings but not those of any other divisions. She did not just observe but questioned the staff, who, like Mr. Tausinga, felt intimidated by her presence.

28. In early 2021, despite speedy replacement of employees in other divisions, Mr. Mauro and Ms. Miller continually ignored the Investigation Division's hiring needs, failing to respond to Mr. Tausinga's February 26, 2021, request to replace Jackie Estrada, an Investigative Aide.

29. In 2021, Mr. Tausinga learned he no longer had access to his employees' accounts on SAGE, the employee management software program for leave approval and monitoring. Mr. Tausinga believed that all other managers had this access. Mr. Tausinga reported this problem to Mr. Mauro but received no response.

30. On March 1, 2021, unlike other Division Leads, SLLDA excluded Mr. Tausinga from a performance evaluation meeting of one of his employees. It was not until he reported this exclusion that he was reluctantly allowed to attend.

31. On March 2, 2021, in an ongoing email chain including other SLLDA employees Fubuki Abe and Diane Grambow, Mr. Tausinga reported again his concerns of SLLDA's mistreatment of him to both Ms. Miller and Mr. Mauro.

32. That same day, Mr. Tausinga followed up on the email to clarify with Mr. Mauro that his email was indeed a complaint of discrimination and retaliation.

33. Although Mr. Tausinga considered reporting to the SLLDA Board, he feared retaliation, including being terminated, because Ms. Miller's husband was an SLLDA Board member and Mr. Mauro had previously denied Mr. Augustin's request to report race discrimination to the SLLDA Board.

34. Mr. Tausinga explained to Mr. Mauro that he felt he had been targeted and singled out because of his race and that he is Pacific Islander.

35. Mr. Tausinga also recounted his previous discrimination report to Ms. Miller when she appeared offended and refused to investigate.

36. Mr. Mauro refused to conduct an investigation (or have an independent investigation), get additional facts, or interview anyone else that felt they were being discriminated against.

37. Instead, Mr. Mauro immediately rejected Mr. Tausinga's complaint, stating "I don't see that . . . there's nothing here that is discrimination against your race."

38. Mr. Tausinga responded, "Okay, but I'm just letting you know how I feel I'm treated by [Ms. Miller]."

39. On March 5th, three days after Mr. Tausinga's complaint, Mr. Mauro summoned Mr. Tausinga to a meeting with him and Ms. Miller.

40. During the meeting, Mr. Mauro continued to dismiss Mr. Tausinga's complaints asking, "Help me understand how that's discriminatory?"

41. Piling on, Ms. Miller also negated Mr. Tausinga's concerns, treating him like a child, and accusing him of not listening, saying "Are you listening? Because it would be nice if you looked at me."

42. When Mr. Tausinga tried to defend himself, Ms. Miller said, "If you don't want to listen and you just want to sit here and stuff, I will quit talking."

43. Mr. Mauro then told Mr. Tausinga:

*This is very very unhelpful to me, very very frustrating, and I'm sorry that you feel the way you do. I really am but you have not given me anything that would suggest to me that there's anything that has gone wrong or that is out of order or that is in any way discriminatory or that you're being treated differently than anybody else.*

44. Instead of accepting Mr. Tausinga's report of discrimination, Mr. Mauro turned on Mr. Tausinga, accusing him for the first time of inadequate performance saying:

*I would tell you I think we give you a lot of leeway. I can show you the expectations that we have . . . and how there are the kinds of things that we're trying to get you to do that I really haven't seen being done on a monthly basis certainly not close in comparison to what social services [expects]. I'm profoundly disappointed right now . . . so what am I supposed to do?*

45. Ms. Miller accused Mr. Tausinga of gender discrimination also for the first time, stating, "it also has come back to me that maybe the reason you don't like my involvement is because I'm a woman."

46. Mr. Mauro then demanded Mr. Tausinga write an apology letter to Ms. Abe and Ms. Grambow for including them in his March 2nd email describing SLLDA's mistreatment.

47. Mr. Mauro then threatened Mr. Tausinga's employment:

*I have to tell you I'm sitting here right now wondering if you are, will continue to be a leader in this office because I'm pretty worried about that . . . your feelings are not relevant to what you think a motive may be because they're not consistent with what the real facts are.*

48. Mr. Tausinga then explained that Mr. Mauro and Ms. Miller could not dismiss how he felt and what he observed in how he and others were treated.

49. Ms. Miller again interrupted Mr. Tausinga to accuse him of telling "untruths" about her.

50. Prior to this meeting, neither Mr. Mauro nor Ms. Miller had questioned Mr. Tausinga's performance, leadership, or credibility.

51. Six days later, on March 11, 2021, Mr. Mauro and Ms. Miller again demanded that Mr. Tausinga write an apology letter to Ms. Abe and Ms. Grambow.

52. Mr. Tausinga did not feel that an apology letter was justified because it was his intention to raise issues of discrimination within SLLDA.

53. When Mr. Tausinga declined to write the letter, Ms. Miller said, "I think what Rich will do is apologize for you to those people and we'll just write down and put it in your file that you refused to provide an apology."

54. Ms. Miller then threatened to sue Mr. Tausinga stating, "Maybe I will go see my own attorney about how I can sue you personally for the way you treat me."

55. Ms. Miller then further restricted Mr. Tausinga from communicating with her, demanding that he must include Mr. Mauro any time he emailed her.

56. Within nine days of Mr. Tausinga's March report of discrimination, SLLDA had:

   a. denied his report without investigation;

   b. berated him;

   c. questioned, for the first time, his performance and leadership skills;

   d. accused him of discriminating;

   e. threatened his job;

   f. threatened to sue him;

   g. accused him of being untruthful; and

   h. restricted his ability to email.

57. As a result of this mistreatment, Mr. Tausinga experienced uncontrollable anxiety, including loss of sleep, loss of appetite, increased irritability, lack of concentration, increased heart rate, and panic attacks.

58. When Mr. Tausinga sought medical care, his doctor directed him to take Family Medical Leave Act ("FMLA") leave, which was approved from March 26-June 21, 2021.

59. In his March 26th email approving Mr. Tausinga's FMLA leave, Mr. Mauro mentioned SLLDA's extended medical leave but failed to mention that Mr. Tausinga could use those benefits after being absent for twenty (20) consecutive working days.

60. After Mr. Tausinga was absent for twenty (20) consecutive working days, SLLDA did not inform Mr. Tausinga that he was eligible for extended medical leave and could retain salary and benefits prior to exhausting his remaining PTO. As a result, Mr. Tausinga exhausted his remaining 148.5 hours of PTO.

61. On May 18, 2021, while Mr. Tausinga was on FMLA leave, SLLDA informed Mr. Tausinga that there was "no evidence" of harassment and that his claim of retaliation was "simply false."

62. Then, on June 9, 2021, as Mr. Tausinga's leave was ending, Mr. Mauro emailed him to ask him to meet at 9 am on June 21, 2021.

63. This email, along with a categorical denial of his report of discrimination, threat to sue him, and the pattern of retaliating against him for his reports of discrimination, caused Mr. Tausinga extreme anxiety episodes, including repeated nightmares wherein Ms. Miller yells at and bullies him.

64. Due to his severe anxiety, Mr. Tausinga's doctor advised him that returning to SLLDA would be detrimental to both his physical and mental well-being.

65. As a result, on June 18, 2021, Mr. Tausinga felt he had no option but to resign his "employment from a place [he] loved and from work [he] found rewarding and

fulfilling" due to the discrimination and retaliation he faced at SLLDA without management willingness to address it.

66. Similarly, two days after Mr. Tausinga resigned, Mr. Augustin also resigned, as he also could not endure the constant level of discrimination at SLLDA.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of 42 U.S.C. § 1981 and Title VII)

67. Plaintiff realleges and incorporates by reference those paragraphs set forth above.

68. Mr. Tausinga is Pacific Islander.

69. Because of his race and ethnicity, Mr. Tausinga was subjected to ongoing discrimination from his supervisors Ms. Miller and Mr. Mauro.

70. Mr. Tausinga was excluded from the evaluation meetings of his own employees.

71. Mr. Tausinga was locked out of the SAGE program and his hiring needs were ignored, which hindered his effectiveness as a supervisor.

72. Mr. Tausinga faced discrimination and harassment so severe that he suffered extreme anxiety, loss of sleep, loss of appetite, and reoccurring nightmares related to SLLDA.

73. SLLDA's work environment was hostile and/or abusive as evidenced by Mr. Tausinga's serious health conditions.

74. Mr. Tausinga took FMLA for twelve weeks in an attempt to recover from the detrimental health effects.

75. However, the thought of returning to work caused a setback and Mr. Tausinga's health deteriorated rapidly.

76. Therefore, Mr. Tausinga had no choice but to resign from SLLDA, resulting in a constructive discharge, which constitutes an adverse employment action.

77. SLLDA knew of the discrimination perpetrated by its managers, but failed to take immediate and appropriate remedial action.

78. Moreover, SLLDA is directly liable for the discrimination by its supervisory level employees.

79. As a result of SLLDA's discriminatory conduct, Mr. Tausinga suffered damages, including lost compensation, lost benefits, and emotional distress.

80. Mr. Tausinga is entitled to punitive damages because SLLDA acted in reckless disregard of his federally protected rights.

81. Mr. Tausinga is also entitled to recover his attorneys' fees and costs incurred in bringing this action.

## SECOND CAUSE OF ACTION
### (Harassment in Violation of 42 U.S.C. § 1981 and Title VII)

82. Plaintiff realleges and incorporates by reference those paragraphs set forth above.

83. Mr. Tausinga is Pacific Islander.

84. Because of his race and ethnicity, Mr. Tausinga was subjected to ongoing harassment from his supervisors Ms. Miller and Mr. Mauro.

85. SLLDA's conduct was unwelcome, severe, and pervasive.

86. Mr. Tausinga faced harassment so severe that he suffered extreme anxiety, loss of sleep, loss of appetite, and reoccurring nightmares related to SLLDA.

87. SLLDA's work environment was hostile and/or abusive as evidenced by Mr. Tausinga's serious health conditions.

88. A reasonable person in Mr. Tausinga's position would find SLLDA's work environment hostile and/or abusive.

89. Mr. Tausinga took FMLA leave for twelve weeks in an attempt to recover from the detrimental health effects.

90. However, the thought of returning to work caused a setback and Mr. Tausinga's health deteriorated rapidly.

91. Therefore, Mr. Tausinga had no choice but to resign from SLLDA, resulting in a constructive discharge, which constitutes an adverse employment action.

92. SLLDA knew of the harassment and hostile environment perpetrated by its managers, but failed to take immediate and appropriate remedial action.

93. Moreover, SLLDA is directly liable for the hostile work environment created and maintained by its supervisory level employees.

94. As a result of SLLDA's harassment and hostile environment, Mr. Tausinga suffered damages, including lost compensation, lost benefits, and emotional distress.

95. Mr. Tausinga is entitled to punitive damages because SLLDA acted in reckless disregard of his federally protected rights.

96. Mr. Tausinga is also entitled to recover his attorneys' fees and costs incurred in bringing this action.

### THIRD CAUSE OF ACTION
### (Retaliation in Violation of 42 U.S.C. § 1981 and Title VII)

97. Plaintiff realleges and incorporates by reference those paragraphs set forth above.

98. Mr. Tausinga reported in good faith race harassment and discrimination in violation of Title VII and 42 U.S.C. § 1981 to SLLDA.

99. Reporting race-based discrimination constitutes protected activity within the meaning of Title VII and 42 U.S.C. § 1981.

100. As a result of these reports, among other things, SLLDA retaliated against Mr. Tausinga by:

   a. Ignoring him;

   b. Berating and yelling at him;

   c. Demanding that he apologize for complaining about discrimination;

   d. Threatening him with discipline;

   e. Threatening to sue him;

    f. Questioning his honesty, credibility, and leadership;

    g. Treating him like a child;

    h. Accusing him of gender discrimination;

    i. Refusing to take his complaints seriously;

    j. Restricting his email activity; and

    k. Denying him proper use of SLLDA's Extended Medical Leave benefits.

101. A reasonable person would have viewed Mr. Tausinga's working conditions intolerable.

102. Mr. Tausinga had no choice but to resign from SLLDA, resulting in a constructive discharge, which constitutes an adverse employment action.

103. Mr. Tausinga faced harassment and constructive discharge as a result of his protected activity.

104. SLLDA's acts would likely have deterred a reasonable person from reporting discrimination and harassment.

105. As a result of SLLDA's retaliatory conduct, Mr. Tausinga suffered damages, including lost compensation, lost benefits, and emotional distress.

106. Mr. Tausinga is entitled to punitive damages because SLLDA acted in reckless disregard of his federally protected rights.

107. Mr. Tausinga is also entitled to recover his attorneys' fees and costs incurred in bringing this action.

## JURY DEMAND

Mr. Tausinga requests that this matter be tried before a jury.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Tausinga prays for the following relief:

1. For payment of lost wages and benefits;

2. For payment of front pay and benefits, in lieu of reinstatement;

3. For compensatory damages, including emotional distress, loss of enjoyment of life, and damage to reputation;

4. For costs and attorneys' fees, as allowed by law;

5. For interest;

6. For punitive damages; and

7. For other and further relief the Court deems appropriate.

DATED this 12th day of July, 2023.

**STRINDBERG SCHOLNICK BIRCH HALLAM HARSTAD THORNE**

/s/Jonathan K. Thorne
Jonathan K. Thorne
Lauren I. Scholnick
*Attorneys for Plaintiffs*